This case is for Bruce Humphrey v. Workers' Compensation Comm'n, 411-0413. Counsel, please. Good morning, Your Honor. My name is William Gregory, and we're here on behalf of the petition of Bruce Humphrey. In regards to this case, Your Honors, Mr. Humphrey worked at Eastlawn Memorial Gardens. Basically, he's a caretaker for a cemetery. As you're aware in reading through the record, Mr. Humphrey worked for this company for 27 years. It was a very physical job, and there is a job description included in the evidence that's before you. And the evidence is that Mr. Humphrey was working in this position for 27 years. He was working without restrictions. He was working full duty in what was clearly a very demanding job. And he was not seeking any treatment prior to the accident that occurred. Now, his initial accident occurred in December of 2003. As you're aware, what had happened was that he was walking on ice, and he slipped and he fell, and he landed on his left elbow and his left arm. There was a small chip fracture in his wrist in addition to an injury to his elbow. Now, after he went and saw the doctors, they determined that there was a pre-existing arthritic condition in his left elbow. But as the evidence also documents, he also has a similar pre-existing arthritic condition in his right elbow as well. All of the medical opinions and all of the evidence agree that the fall that occurred aggravated this condition that was in his left elbow. He wasn't having pain. He wasn't having problems with loss of range of motion. Well, the arbitrator found that there was no causal connection, didn't he? The arbitrator found that there was a temporary... I mean, they found no causal connection in regards to the condition at the time of the hearing. The arbitrator found that he had sustained a temporary aggravation of the condition in his elbow, and the arbitrator found that the condition, that the aggravation had resolved in August of 2005. And that there was no repetitive trauma. Correct. That was the finding of both the arbitrator and the commission, that there was no repetitive trauma, but they found... The condition had been resolved is what they felt. At the time of the hearing, correct. They had felt that the issue had been resolved. The arbitrator ruled that the issue was resolved on August 11, 2005. The commission, in their review, determined that it had not resolved on August 11, 2005, but instead determined that it had been resolved on January 22, 2004, which is actually approximately 45 days after the accident took place. And one of the reasons we're here in this case is because of that finding, obviously, because if you look at the medical records and you look at the history, this is a man who's working, had absolutely no problems with being able to do this job. What did Keefe testify to? I'm sorry? Kraft. What did Kraft testify to? Well, Kraft testified that he believed that, his report indicated that he believed that he suffered a temporary aggravation as a result of the fall. He agreed with the chip fracture in the wrist, but he said in regards to the elbow, that the petitioner suffered a temporary aggravation of the left elbow that would have resolved in somewhere between three and six months, was his estimation. And the date that they gave for MMI, May of 2004, falls within the period of time that Kraft estimated there would have been stabilization. The commission found MMI on January 22, 2004, which is not within the time that Dr. Kraft estimated. The other thing I guess we would say is that Dr. Kraft's report, Dr. Kraft didn't examine him until 2007. And so he's going back and looking, I mean, he didn't examine him in 2004, 2005, 2006. I mean, Dr. Kraft didn't examine him until December of 2007. And at that point, he went back and said, you know, I believe that there was a temporary aggravation. It probably resolved somewhere in three to six months out. And then the commission said, well, we find that he's at MMI 45 days out. Well, the only reason that there's an issue with regard to the MMI date is the case standard fall on Kraft. Didn't Dr. Dustman specifically concur in Kraft's findings? Yes, he did. He did, but he also – I'm sorry. And then we have Dr. Nicholson. He did not reference any repetitive trauma injury. He concluded that the ongoing symptoms were not due to any work activity, but to the quote-unquote natural consequences of degenerative arthritis. So isn't there evidence in the record to support the commission's decision? Well, I understand that point, but also I believe that the manifest way to the evidence is that all of the doctors, as they're going through this, Dr. Kraft said he should avoid the repetitive activities because they aggravate this condition. Dr. Nicholson said the exact same thing. Dr. Dustman even said he can't keep doing this job because it's aggravating his condition. I mean, all of the doctors noted in their reports that his ongoing activities at work were aggravating this condition. And so while I understand what the court is pointing out, it's our opinion that what the doctors actually stated in their ultimate – in the conclusions that they drew are inconsistent. Well, is that really true? If Nicholson concludes that any ongoing symptoms, any symptoms, are not due to any work activity, but due to the natural consequences of degenerative arthritis, where is that saying that it aggravated, the work aggravates it at all? He's saying it's got nothing to do with it. But then if you read on, and actually the respondent pointed this out in their brief, if you look on page 10 of their brief, they noted that Dr. Nicholson stated that the fall stirred up a vulnerable elbow, and now he has lost considerable motion on the left and has pain. That is not specifically due to the fall, but due to the degenerative process itself. But he even clearly notes, if you look at his reports, he says, okay, this guy has similar conditions in the left and the right. And what we want to do as far as treating him is going to make the left basically the same as the right. The only difference between the left and the right, other than the fact that his right is his dominant hand, is that he had a fall where he landed on the left elbow. And, I mean, Dr. Nicholson says the fall stirred up a vulnerable elbow, and now he's lost considerable motion on the left and has pain. Well, that's his problem. Was that a repetitive trauma case, or was that a specific case for which he was captive? Well, we filed both. I mean, we filed a specific case. And he won in the first case, right? I mean, they found there was a work with their hands. They found a causal connection on the first, but then they ruled that he reached an MMI and that the surgery would not be related to that. And I guess, I mean, it's our position that it is related to that, and it's also related to the fact that he continued to do this work. Because it's clear from all of the doctor's notes that his ongoing participation in this job continued to aggravate his condition and continued to make it worse. And so, I mean, I think... The commission obviously didn't buy that, did they? No, the commission ruled that that was not the case. But if you look at it, I mean, clearly, all of the evidence, and I guess the way I look at it, I mean, what the doctors have said, what the evidence shows is that this fall was a factor in his pain and his ongoing complaints. I mean, he had nothing prior to the fall. He goes into the fall. I mean, the commission found that he reached MMI on January 22nd of 2004. The only reason that they gave was because he stopped seeing Dr. Nord at that point. But his testimony was that he specifically wanted to go see Dr. Dustman. I mean, he saw Dr. Nord because his family practitioner is also Dr. Nord. I mean, there's Dr. Paul Nord and Dr. Larry Nord. He initially saw Dr. Paul Nord, who's his family physician. Dr. Paul Nord actually sent him across the street and said, hey, I don't handle this. My brother's office is right next door. Go see him. So he goes across the hallway and sees the other Dr. Nord. He sees him a couple times and says, you know what? I know Dr. Dustman. I would rather treat with Dr. Dustman. So he exercises his option to go and see his own doctor. And so he went and saw Dr. Nord a couple of times. And then after that he said, okay, I'm going to go see Dr. Dustman. The commission said, well, the last time he saw Dr. Nord was when he reached MMI. Well, that doesn't make sense if you read Dr. Nord's notes and then you read Dr. Dustman's notes from three weeks later. Because Dr. Nord notes the last time he saw him, he still has a serious loss of motion, loss of range of motion. And when he goes and he's still having pain, he's still having complaints, he goes and sees Dr. Dustman three weeks later, same complaints, same problems. So as far as... Well, what is the problem due to? Is it due to the degenerative nature of his problem or is it necessarily connected to work? I mean, that seems to be the issue here. One of the doctors, the doctor is going to be saying, hey, he was going to have to continue to have problems for the rest of his life no matter what he was doing. Well, he had the preexisting condition no matter what he did. But he also has the same preexisting condition in his right elbow. And he doesn't need any treatment on his right elbow. He doesn't need surgery on his right elbow. I mean, what he needs is treatment on his left elbow. And so all of the doctors agree that this fall aggravated that condition. And so the question is, what is the extent of that aggravation? And is the surgery related to that aggravation? And we would present that it is because of the fact that he doesn't... he didn't need it before the fall. He didn't have the pain. He didn't have the loss of range of motion. Dr. Nicholson specifically testified, or in his letter, specifically stated that the purpose of the surgery was to remove... was to relieve the pain in his elbow and to help him in his range of motion and to make his left elbow basically the same as what his right is. Well, I mean, if the aggravation is the pain in his elbow, and if the aggravation is the loss of range of motion, and if that is what the surgery is intended to treat and is intended to take care of, and if those factors started on the date of the fall and have never resolved... I mean, he went through and he had several injections, which relieved those problems temporarily. But the problems never went away. The problems were never resolved. The fact that they were never resolved, is that due to the work that he's doing or is it due to the degenerative condition that he's suffering from? The commission says it didn't resolve because of the degenerative condition, not because of his work. So why is an applicant's conclusion clearly apparent? That's what you've got to focus on, because at best, your argument is, at best, there's conflicting medical evidence. Well, I believe that they can be... I guess the way I was trying to say this is, I don't believe that... I believe that the conclusions of the doctors are what's conflicting with what the doctor's notes actually state. Because if you look at what the doctor's notes actually state, the doctor's notes actually state, all the way through this, that those complaints never resolved and that those complaints were constant from the date of the accident on and that his work activity aggravated this condition and continued to aggravate this condition to the point where Dr. Guzman said, I think you probably need to find a new job. Because as long as you're doing this job, you're going to continue to have ongoing complaints and you're going to continue to have problems with this elbow. And, I mean, this is not just... I mean, he's not sitting at a desk. He's not flipping burgers. He's not even working an assembly line lifting 10-pound boxes. I mean, if you look at his job description in there, lifting between 300 and 300 pounds, setting up tents, 0 to 600 pounds, pulling an empty casket, 75 to 200 pounds, lowering devices, he has to be able to lift full caskets into a crypt up to 500 pounds, lifting granite up to 400 pounds. I mean, this is something where, all day long, he's out there doing extremely heavy-duty activities using his arms and his elbows. And, I mean, it was to the point where even... Off the top of my head, I don't recall which doctor said, I'm not sure that a perfectly healthy person can actually do this job. You know, and the fact that you're able to do this. And so, I guess the first thing we're asking is that, in regards to the initial claim, is that the manifest way that the evidence is that he has not reached MMI. And Dr. Nicholson agrees with that. Dr. Nicholson stated that he has not reached MMI. So, in your opinion, when did he reach MMI? I don't believe he has reached MMI. When did he last see a doctor in connection with him? Was it in May? When did he last get treated for it? Was it in May? The last treatment was... It was in May, wasn't it? It was in May of... Well, he saw the doctors up through May, and they did an injection. He came back. A year later, got another injection. I'm sorry, but I mean, for a while, there was a period between May and the next year when he wasn't treated, correct? Yes, and that was due to the injection, which temporarily relieved those problems, but the problems didn't go away. I mean, it was still something where he still had restrictions on his work that he testified to. And so, the medical evidence doesn't say, hey, he's pain-free, this is resolved. We gave him an injection to mask it so that he can go back to work, and we want him to live with it as long as he possibly can before we do the surgery. So, they didn't say in May of 2004, hey, this is resolved. They said, hey, we're going to cover this up, and we want you to work with this as long as you possibly can. And so, as far as evidence that he ever reached MMI, there is none. All of the doctors knows, even Dr. Kraft. Dr. Kraft, when he saw him in 2007, said he still has that loss of range of motion of 50 degrees. He still has pain in his left elbow. That's the same injury and the same problem that he had in December of 2003, January of 2004. Your time is up. You'll have a short time on the rebuttal. Counsel, please. Thank you. Good morning. Justices, counsel, I'm Susan Garber from Nyingen, Pembroke, Kinsey, and Lowery on behalf of East Lawn Memorial Garden. It is respectfully submitted that the decision of the commission in this case is supported by a manifest weight of the evidence and should be affirmed in its entirety. The decision of the commission that claimant failed to prove accidents on August 11, 2005, and July 20, 2006, is supported by a manifest weight of the evidence. Both of these accident dates are predicated on a repetitive trauma theory. This is a question of fact for the commission. First, we have to look at whether or not the petitioner's claimant's job was repetitive. It is submitted that there is no medical evidence in the record to support a repetitive trauma theory. The claimant even testified that his job duties varied day to day, hour to hour. Even assuming the claimant had proved that his job was repetitive, there's no medical evidence presented to establish a repetitive trauma case. There's no medical evidence to support the opposite, that it was not repetitive trauma. Correct. What is that evidence? Well, Dr. Nicholson stated that the left elbow is not due to the fall and not related to work activity. The commission correctly found that there was no repetitive trauma in this case for either the 2005 or the 2006 accident. The commission also correctly found that the claimant failed to prove causal connection with the December 14, 2003 accident. There's no disagreement that claimant suffered a work accident in December 2003, and there's no disagreement that the claimant had pre-existing arthritis to the left elbow. What is in disagreement is whether the aggravation to the pre-existing condition was causally related to the work injury. This is, again, a question of fact for the commission, and we believe there's ample evidence in the record to support the commission's finding. Let's go through the medical evidence a little bit. First of all, Dr. Dussman, the treating physician in this case, found that Petitioner did have an aggravation of his pre-existing left elbow arthritis, but his opinion is equivocal at best. He states that the progression of the arthritis would have happened regardless of the job. He then reviews the employer's independent medical evaluator's opinion, Dr. Kraft. Dr. Kraft found that the suggested surgery for the left elbow bared no relationship to the incident in December 2003. Dr. Dussman reviewed that report and stated that he concurred with Dr. Kraft's opinion. The employee sought his own independent medical evaluation with Dr. Nicholson. This evidence alone is enough to support the commission's finding. What did Nicholson opine? Dr. Nicholson found that the fall was a non-factor in the need for surgery. He found that the fall and the injury were not the cause of the current elbow disability. He found that if the claimant wished to have future treatment, it would not be a consequence of the work-related injury. And this was the person the claimant found on his own? Exactly. This is their expert, the person that they went and sought out not once but twice. They asked for an addendum report after the initial report. So it's our position that the commission correctly did their job by weighing all the evidence and finding the claimant failed to prove the causal connection between the need for the left elbow surgery and his current condition of well-being and the work injury. I do have a question about the MMIB. The commission set it as of January 22, 2004, ostensibly because that was the last date we saw Dr. Nord. There's no indication in Dr. Nord's progress notes that the claimant had reached MMI in that date. The only physician who expressed and discussed the date of MMI was Kraft, and then Kraft estimated the claimant would have reached maximum medical improvement three to six months after the fall. Clearly, he put it outside January. So where is this January 22 date supported by the evidence? Well, in my review of the note from January 22, 2004 from Dr. Nord, I found that he returned claiming to work full duty and stated that he could follow up as needed. There was no referral to another doctor. There was no indication of any further treatment. And then after that, the claimant went on his own and found Dr. Dussman, who apparently had treated his daughter and wanted to get his opinion and started treating with Dr. Dussman. Except he saw Dr. Nord the following month, did he not? In January of 2004? Well, that was the MMI date that the commission gave. The January 22, 2004 was the last time he saw Dr. Nord, and the first time he saw Dr. Dussman was in February 2004. And he saw her in May 2004, correct? Dr. Dussman, yes. But after that, he didn't see anybody for you. Right, and then for another year after that, he treated very sporadically with Dr. Dussman. And with regards to the MMI date, it's our position that there's enough evidence in the record to support that the MMI date should be January 22, 2004 based on the no referral and to follow up as needed. That was what the January 22, 2004 note from Dr. Nord stated. And then the claimant went on his own to find Dr. Dussman and treated on his own with no referral or no indication from Dr. Nord that he needed any further treatment. It's a question of fact for the commission. Could another inference be drawn? It could, but that doesn't necessarily mean that the commission's decision is against the manifest rate of the evidence. As I pointed out earlier, the January 22 date is supported by the record. Also, the commission's decision denying medical benefits, specifically Dr. Dussman's bill, is supported by a manifest rate of the evidence. As previously noted, there was no causal connection found in this case, and therefore the medical benefits should not be the responsibility of the employer. And the commission correctly found no causal connection and therefore correctly found that the medical benefits would not be awarded. Unless you have any further questions for me, I thank you for your time and ask that the commission's decision be affirmed in its entirety. Thank you, Counselor. Rebuttal. Just briefly, I guess I would just like to state that. Well, you couldn't convince Molly Mason or Mr. Donahue, commissioners on this case, that she was correct. Isn't that right? Well, obviously you have their decision, so I mean. Well, you had it. Hopefully you've got it. Yes, I do. I do. I mean, but I guess in regards to the repetitive nature of his work, again, I understand that Mr. Humphrey testified that he does various activities throughout the day, but if you look at the activities that he does, they all involve repetitive motion. I believe that the records of the doctors also reflect that he was doing repetitive activities. But, you know, I would just like to state, you know, Dr. Kraft, you know, and I noted page 126 of the record, in his records he states that the pain and discomfort are improved by decreasing physical activity, changing positions, and decreasing his repetitive motion. In regards to Dr. Nord's visit in January, all along Dr. Nord had basically stated that the petitioner should do what he can. I mean, he never imposed any specific restrictions on him, you know, even from day one. He basically said, do what you can do. So as far as the fact that his work restrictions remained the same on January 22nd of 2004, that those were the work restrictions, that didn't change. So that was the same as they were on the date of the injury. And in his treatment prior to January 22nd of 2004, Dr. Nord, his notes do not reflect that he had reached maximum medical improvement at that time. It did not reflect that he had no ongoing complaints. In fact, it documented exactly the opposite. And so the fact that he changed doctors at that point, we believe that that's not a basis for saying that he reached maximum medical improvement at that point. And so we believe that the manifest way to the evidence is that he did not reach maximum medical improvement on January 22nd of 2004. You're alleging he's never reached MMI, right? Correct. I mean, he needs a surgery. I mean, it's our position that he needs that. That's the reason why we're here requesting that they be required to pay for this surgery, because this is what the doctors have said that he requires. They have went through the process of doing conservative treatment to try to put off the surgery as long as they can, just because of the serious nature of this. And that's been the approach since day one with all of the doctors. If you look through the notes, they have been putting this off and saying, live with it as long as you can, because this is not a simple surgery. This is something that's going to affect you. And so it's something where they've been treating it with conservative measures, trying to just get him along as long as they possibly can. And so it's our position. But there's no indication in the record that this aggravation or the symptoms relating from this fall have ever resolved. And so that's why we believe that the commission's finding that he reached MMI in January of 2004, and even the arbitrator's findings that he reached MMI in August of 2005, are against the manifest weight of the evidence, because there's no evidence that he's reached MMI. Thank you. Of course, we'll take the matter under advisory to disposition.